United States District Court

Eastern District of Pennsylvania

Charles Talbert                                    Civil Action

v.

Pennsylvania State Correctional
Officer Association; John Wetzel;
Jaime Sorber; Laurel Harry; K.                     No.
Owens; G. Orlando; T. Heist; D.
Varner; J. Schnech; J. Yodis; Z.
Moslak; K. Long; Z. Fahnestock;
Lt. Mason; Lt. Washington; Lt. K.
Young; Lt. P. Curran; Lt. Wés; Sgt. J.
Carr; Sgt. Hunter; Of. L. Lemanowicz;
Of. D.A. Brown; Of. Schmuck; Dr. Prince;
Dr. Vardstadt; J. Patel; L. DeBeer; Dr.
Matteo; C. Hydro; Tom Wolf.                        Complaint

FILED
SCRANTON

JUL 0 6 2020

Per_____
DEPUTY CLERK

1. Parties:

1. Plaintiff, is an adult individual.

2. Pennsylvania State Correctional Officer Association (PSCOA), is a cor-
   poration, in business to provide correctional officers within the
   Pennsylvania Department of Corrections (DOC) labor union services.

3. John Wetzel (Wetzel), is the Secretary of the DOC.

4. Jaime Sorber (Sorber), and Laurel Harry (Harry), are both
   Superintendents employed by the DOC.

5. K. Owen (Owens), G. Orlando (Orlando), and T. Heist (Heist), are all
   Grievance Coordinators employed by the DOC.

6. D. Varner (Varner), is the Chief Grievance Officer for the DOC.

7. J. Schneck (Schneck), and J. Yodis (Yodis), are both Hearing Examiners for the DOC.

8. Z. Moslak (Moslak), is the Chief Hearing Examiner of the DOC.

9. K. Long (Long), and Z. Fahnestock (Fahnestock), are both Mailroom Supervisors for the DOC.

10. Lt's Mason, Washington, K. Young (Young), P. Curran (Curran), and Weis, are all Lieutenants employed by the DOC.

11. Sgt. J. Carr (Carr), and Sgt. Hunter (Hunter), are both Sergeants employed by the DOC.

12. Of's L. Lemanowicz (Lemanowicz), D.A. Brown (Brown), and Schmeck, are all Correctional Officers employed by the DOC.

13. Dr. Prince, is a Regional Medical Director for the DOC.

14. Dr. Vordstadt, is a Medical Doctor for the DOC.

15. J. Patel (Patel), and L. DeBoer (DeBoer), are both Certified Registered Nurse Practitioners for the DOC.

16. Dr. Mattec, is a Psychiatrist for the DOC.

17. C. Hydro (Hydro), is a Psychologist for the DOC.

18. Tom Wolf (Wolf), is the Governor of the Commonwealth of Pennsylvania.

19. Defendants are sued in their personal and official capacity.


II. Jurisdiction:


20. This civil action is brought under 42 USCS 1983 and Article III of the Constitution of the United States.

21. Jurisdiction is founded under 28 USCS 1331, and 1343 (a)(3).

22. Supplemental jurisdiction is founded under 28 USCS 1367 (a).

23. The claims mentioned herein are as follows:

(A) Abuse of Process.

(B) Civil Conspiracy.

(C) Civil RICO 18 USCS 1962 (c) and (d).

(D) Making And Enforcing Laws To Abridge Plaintiffs Right:

    (i) not to be deprived of liberty, life, and or, property without due process of law;

    (ii) to a speedy trial.

(E) Unreasonable Seizure of Constitutionally Protected Property.

(F) Religious Land Use And Institutionalized Persons Act.

(G) Inhumane Conditions of Confinement.

(H) Right To Freedom of Speech and Association.

(I) Retaliation.

(J) State-Created Danger Theory.

(K) Class-of-One Theory.

(L) Supervisory Liability.

(M) Corporate Liability.

(N) Unjust Enrichment.

(O) Excessive Use of Force.

(P) Deliberate Indifference.

(Q) Doctrine of Separation of Powers.

(R) Declaratory Judgments Act, 42 Pa.C.S. Subsect. 7531-7541.

(S) Misfeasance In Office.

24. Injunctive Relief pursuant to Fed.R.Civ.P. 65.

25. Plaintiff additionally seeks monetary relief in the form of compensatory, punitive, exemplary, treble, and special damages in an amount in excess of $250,000.00, costs, fees, and prejudgment interest.


III. Statement of Claims:

26. On or about January 8, 2019, Philadelphia police arrested and subsequently charged Plaintiff with, inter alia, two alleged bank robberies, in which, the Federal Bureau of Investigation (FBI), on two separate occasions, cleared him of any participation thereof.

27. At this time, Plaintiff was out on bail on another alleged assault case.

28. On December 18, 2019, the jury acquitted Plaintiff of the serious felony charges, but guilty on the misdemeanor's due to Judge Brinkley's misinformed instructions for deliberation.

29. Accordingly, on December 23, 2019, Plaintiff was transferred from the Philadelphia Department of Prisons (PDP), to SCI-Phoenix (Phoenix), an institution under DOC jurisdiction.

30. When the Philadelphia Sheriffs' informed Curran that Plaintiff had represented himself in Federal Court, and in the Superior Court on his appeal, and required access to all of his legal papers and reference books, Curran still threatened to discard the Plaintiffs legal, and reference materials, if he did not have them mailed out of Phoenix at his own expense.

31. Due to Curran unreasonably seizing and confiscating Plaintiffs legal and reference materials, with intent to discard it, the Plaintiff was forced to send his aforesaid materials to his Federal Judge, at the cost of $49.19.

32. The Judge, however, returned Plaintiffs property to the mailroom at Phoenix, directing Long, the Mailroom Supervisor, and the staff at Phoenix, to provide Plaintiff with all of his legal papers, and constitutionally protected property upon searching it for contraband.

33. However, Long, and Mason (the Property Lieutenant at the time), had searched Plaintiffs property, yet, only provided him with

his legal papers, and unreasonably confiscated and seized his legal and reference books that costs about $200.00.

34. Accordingly, on or about January 13, 2020, Corran, Long, and Mason had intentionally and maliciously caused Plaintiff to be transported to SCI-Camp Hill (Camp Hill), without his aforesaid publications.

35. Upon arrival into Camp Hill, other prisoners were able to wear their yarmulkes, and religious crosses, yet Schmuck the intake inventory officer, disallowed Plaintiff the same religious rights, and accordingly made Plaintiff take off his Islamic kofi, and Islamic chain.

36. Despite Plaintiff having on his Islamic chain in the BOP and at Phoenix, Schmuck made false, and fraudulent representations, saying that his chain was contraband, and forced Plaintiff to send it out of the prison at his own expense, or it would be destroyed.

37. Accordingly, due to Schmucks unreasonable seizure of protected religious property that cost $150.00, Plaintiff was forced to mail it to his Federal Judge at the cost of $3.77.

38. The Judge sent the Islamic chain back to Plaintiff at the mailroom at Camp Hill, along with various manila envelopes with legal papers inside regarding his open civil matter.

39. However, on January 28, 2020, Web, the Security Lieutenant at Camp Hill, had intentionally, and maliciously, unreasonably seized, and confiscated Plaintiffs Islamic chain, saying that it was contraband, and also unreasonably seized, and confiscated, all of his legal mail that his Federal Judge sent him, making false, and fraudulent representations, saying that the legal mail was contaminated with methamphetamines.

40. Plaintiff never received his legal mail, or his legal and constitutional Islamic chain, to which Weis wrongfully discarded.

41. On or about February 6, 2020, Fahnestock, the Mailroom Supervisor at Camp Hill, had aided and abetted Weis in his false and fraudulent representations of the legal mail being contaminated with methamphetamines, and the chain being contraband.

42. Accordingly, on or about February 11, 2020, Schmuck, Weis, and Fahnestock, caused Plaintiff to be transferred to SCI-Dallas (Dallas), without his legal mail, or Islamic chain.

43. At this point in time, Plaintiff had been imprisoned on his bank robbery charges for approximately 13 months, without having a trial, and with his criminal appeal on the misdemeanors filed on January 13, 2020 in the Superior Court, the Court therein had up until May 13, 2020 to make a decision upon his sentence, and possibly the entire case for dismissal of all charges.

44. Plaintiffs lawyers on his robbery charges filed a motion on behalf of Plaintiff, which was scheduled for March 24, 2020, with a new trial date scheduled for May 15, 2020.

45. Accordingly, Plaintiff was brung down from Dallas to Phoenix on writ on the 10th day of March, 2020 to await his motion hearing.

46. On said date of arrival back into Phoenix, an intake Lieutenant named, Lt. Darian, informed Plaintiff that he was entitled to all of his legal materials, to which he would need while on writ.

47. However, on said date, Property Sergeant Carr had unreasonably seized and confiscated all of Plaintiffs legal materials in regards to grievances filed against Corran, while other prisoners brung down on writ, received all of their property.

48. Carr, continued to unreasonably seize Plaintiffs legal materials

on March 10TH, 11TH, and 12TH of 2020, to which another Lieutenant, Lt. K. Patterson, on each occasion, sought to help Plaintiff get his legal property that Carr was maliciously adamant on not allowing Plaintiff to receive.

49. On March 12, 2020, when Officer Lemanowicz, and Brown, had secured Plaintiff in his cell, Lemanowicz and Brown began to maliciously, and sadistically, pull on the leash that was connected to Plaintiffs handcuffs, through the food slot, in the center of the door, causing Plaintiffs wrists, and thumbs, to get excessively pinned up against the metal door, from the inside of his cell.

50. Lemanowicz then told another officer to pepper spray Plaintiff through the food slot, to which discharged a burst of it into his face, nose, and eyes, causing them them immediately burn and cause temporary blindness.

51. When Plaintiff came out of his cell to get decontaminated by medical staff, Brown began to excessively choke him from behind by his collar, to which Plaintiff tried to let him know, until Brown and Lemanowicz slammed Plaintiff on the hard concrete.

52. While Plaintiff was facing sideways, with his hands now cuffed from behind, Brown used unnecessary and unreasonable excessive force again, by laying his knee onto his head and putting all of his weight down on his head and face causing undue, and excruciating pain, and inability to breathe.

53. That same night on March 12, 2020, Plaintiff asked to go on suicide watch, on the mental health block due to his feelings of hopelessness, suicidal thoughts, and anxiety, along with major stress, depression, and mental anguish.

54. Plaintiff remained in a psychiatric observation cell for several days complaining to several staff members regarding him needing his legal materials that Carr confiscated, the assault, and what trauma these events had caused him.

55. On March 11, 2020, the World Health Organization (WHO), declared a coronavirus pandemic.

56. Several areas of Pennsylvania began to experience many positive cases of the coronavirus disease, with Montgomery County having a major outbreak of it upon its residents.

57. Phoenix, is located in Montgomery County.

58. However, even with known positive cases in Montgomery County and some within Phoenix, when Plaintiff came out of the suicide cell and into an observation cell in solitary confinement, the morning Lieutenant, Young and Sgt. Hunter, had first given him all of his legal materials that Carr unreasonably seized, and then moved him into another cell with another inmate when the prison was supposed to be in quarantine, and practicing social distancing.

59. On March 20, 2020, Wetzel, and Sorber, ordered all Phoenix staff and inmates to wear masks while on quarantine, while Wolf, around this same time-frame, ordered "non-essential" businesses to close, giving businesses until April 1, 2020 to respond to his unconstitutional executive orders.

60. During this same time-frame, the First Judicial District Court of Common Pleas, and Superior Court of Pennsylvania, had shut its doors to the public, and failed to provide any alternative means of adjudicated process, due to Wolfs orders.

61. While in isolation in the segregated housing unit, Young had caused another inmate from the general population to be put in

Plaintiffs housing cell after the first one went someplace else.

62. The second cellmate began coughing everyday while in there, causing Plaintiff anxiety, from fear of contracting the virus.

63. When that cellmate left after 3 days, Young attempted to place another inmate from general population into Plaintiffs cell, to which Plaintiff refused, and accordingly, was given a misconduct as punishment for protecting his own safety.

64. During this time of Young placing inmates from general population into Plaintiffs segregated housing cell, several staff and inmates in the general population areas contracted the virus, and was dying and/or dead already from it.

65. Wetzel, Sorber, nor Young, established a procedure to have the general population inmates checked by medical staff members, prior to having them interact with inmates, like Plaintiff, that was safe in isolation, during the time of the deadly outbreak.

66. This demonstrated gross negligence, carelessness, and deliberate indifference upon the safety of Plaintiff, by Wetzel, Sorber, and Young, failing to take reasonable, and cautionary steps, to keep separated, healthy, and possibly infected inmates.

67. Accordingly, on March 24, 2020, Wolfs' unconstitutional, and un-precedent executive orders to close the criminal courts down, deprived Plaintiff of his motion hearing without due process.

68. Wolfs executive orders to shut the criminal courts down, was also overreaching, since criminal courts are "essential" in nature, to provide individuals the State and Federal Constitutional right to access the Court, and to have a speedy trial which are fundamental rights that cannot be deprived of without due process of law, which Wolf failed to provide.

69. On May 12, 2020, Plaintiff was moved from cell 2003 on A-B unit, to an observation cell (1005) on the bottom-tier, after an altercation occurred between him and a disrespectful officer.

70. After being secured in cell 1005, Hunter unreasonably seized all of Plaintiffs' legal, religious, and hygeine property, in spite of the altercation between Plaintiff and his subordinate.

71. Hunter did not have legal authority to seize Plaintiffs legal or other constitutionally protected property, which demonstrated an abuse of authority.

72. Plaintiff had on his person, a razor which was previously kept and used to shave his head with.

73. Plaintiff began to feel hopeless and suicidal again due to Hunter unconstitutionally seizing his protected property.

74. Plaintiff then began to break the razor to where the blade was taken apart from the safety gaurd around it, and had slashed his left wrist several times causing it to bleed heavily.

75. The officer notified Hunter, to which Hunter arrived a few minutes later on the outside of Plaintiffs cell door, and told Plaintiff to, "keep cutting", in a gross negligent, careless, and malicious manner.

76. Approximately twenty minutes later, a Lieutenant assigned to A-Block, had arrived at Plaintiffs cell door and seen his arm.

77. The Lieutenant then ordered the officer with him to turn on the hand-held video camera, with visual and audio capacity, and then handcuffed Plaintiff from the front, while Plaintiff now had the razor in his mouth.

78. Upon reaching medical triage, that Lieutenant advised medical staff, on video, that Plaintiff cut his own wrist, and still had

the razor blade in his mouth.

79. Plaintiff then said on video that he wanted to either speak to the Superintendent Sorber in order to get his legal property, or he would swallow the razor blade in his mouth.

80. The nurse reiterated Plaintiffs demand to Dr. Matteo over the triage phone, to which Dr. Matteo, and the mental health unit Lieutenant, Washington, shortly arrived thereafter.

81. After informing Dr. Matteo again of Plaintiffs request, with knowledge of Plaintiff being a harm to himself with a razor blade in his mouth, Dr. Matteo neglected Plaintiffs safety by refusing to intervene and provide Plaintiff any psychiatric services during this crisis situation.

82. Nevertheless, Plaintiff was transported to the suicide unit again, after Washington made gestures with his hands of a person hanging themselves, mocking, and influencing Plaintiff to kill himself.

83. Once in the suicide cell, Washington told Plaintiff to go on and kill himself now by swallowing the razor blade that he knew Plaintiff possessed.

84. Dr. Matteo came down to see other inmates in suicide cells, yet, disregarded Plaintiffs condition.

85. The nurse assigned to the suicide unit seen Plaintiffs arm and razor blade, and contacted the shift-commander about his condition and being in a suicide cell with a razor.

86. Plaintiff became frustrated and cut his wrist a few more times to which he received no help, only influence by Dr. Matteo, and Washington, to go on and kill himself.

87. Later on in the day, a Captain came down to the mental health unit, and promised to have Plaintiffs legal property back in his

cell upon return to his housing unit should he give up the
razor.

88. Plaintiff gave the housing unit officers on the suicide block the
razor to which the following day Plaintiff returned to cell
1005 where his legal materials were at as promised.

89. However, several articles of hygeine products, and Philadel-
phia Inquires newspapers, to which cost Plaintiff approximately
$50.00, had been confiscated by Hunter.

90. Being as though Plaintiff went to a psychiatric observation cell
after cutting his wrist, Hydro was supposed to provide him
psychological services to observe his behavior and mental
state.

91. However, since Plaintiff been at Phoenix, Hydro completely denied
Plaintiff care and treatment, while providing others on his unit
with care and treatment.

92. Dr. Matteo, also, deprived Plaintiff psychiatric care and treatment,
while providing others on the unit some form of care and
treatment, whether through counseling or medication.

93. Dr. Matteo and Hydro deprived Plaintiff access to any other
mental health providers that could have provided him the care
and treatment necessary to reduce his hopelessness, anxiety,
stress, depression, mental anguish, personality disorders, para-
noia, and any other illnesses he had been diagnosed with.

94. Plaintiff suffers from chronic and acute excruciating lower-
back muscle spasms, to which it has been diagnosed by
several treating physicians, both in, and out of the prison
setting, to be prescribed Flexeril muscle-relaxants to help
alleviate flare-ups.

95. However, Dr. Prince, Dr. Vordstadt, Patel, and DeBoer, between

January 13, 2020, through March 13, 2020, had deprived Plaintiff of a prescription for Flexeril for no medical reasons.

96. Patel denied Plaintiff a prescription for Flexeril in retaliation for Plaintiff filing lawsuits against him and other Corizon Health medical staff members.

97. Dr. Prince, Dr. Nordstadt, Patel, and DeBoer, all knew Plaintiff was suffering from excruciating pain from his spasms, yet, knowingly and maliciously caused him to continue to suffer in pain by their deliberate deviation from the accepted standard of care.

98. Dr. Prince, Dr. Nordstadt, Patel, and DeBoer, never examined Plaintiffs lower-back to determine its diagnosis, yet, with an un-informed medical decision, deprived Plaintiff a prescription for Flexeril, while others similarly situated, was ordered it while under their immediate care.

99. Between December 23, 2019, and June 15, 2020, Plaintiff was im-prisoned within the DOC as both a state prisoner on his sentence case, and pretrial detainee on his open criminal matters.

100. During the aforementioned time-frame, Sorber, Owens, Orlando, and Varner had individual and official employment duties and respon-sibilities of reviewing, investigating, and responding to prison grievances filed by Plaintiff, at Phoenix.

101. During this same aforesaid time-frame, Harry, Heist, and Varner, had individual and official employment duties and responsibili-ties of reviewing and responding to grievances at Camp Hill after adequate and thorough investigation.

102. Wetzel, established and maintained these individual employ-ment duties and responsibilities through his policy statement under DC-ADM 804.

103. However, DC-ADM 804 only provides vague and unduly broad

procedures of how and when an inmate is to file a grievance, yet has intentionally, through calculated and deceptive forethought, failed to provide the inmate with essential correlative procedures which identifies the proper investigative routine, technique, and/or, formalities, that must be conducted for adequate review.

104. This deficiency in DC-ADM 804, undermines the inmates ability to determine whether adequate steps were followed to conclude a denial or rejection of his meritorious grievances, which further undermines the inmates ability to file an appeal and challenge the process which was inadequately provided.

105. This aforesaid undermined policy and procedure, is the source behind Sorber, Harry, Owens, Orlando, Heist, and Varner's opportunity to alter, and improperly use the grievance process, in a manner that decieves inmates into believing that they will adequately receive due process when filing, yet, contrarily, fails to investigate the underlying unconstitutional conduct, and merely rubber stamps each others agreement to reject and deny them.

106. With knowledge of the exhaustion process being made part of the federal litigation process, and/or, cycle, is the moving and motivating factor, of the aforesaid routine alteration and improper handling of inmate grievances, with intent to aid and abet the cover-up and/or condone the illegal, wrongful, and unconstitutional issues and conduct in which Phoenix and Camp Hill employees and contractors are guilty of, which ultimately causes a perversion of that process.

107. Sorber, Harry, Owens, Orlando, Heist, and Varner, through various formerly, and/or, electronically filed grievances, are aware of Plaintiff being involved in civil litigation, to which is the

moving, and motivating factor, in which influenced the afore-
mentioned Defendants into rejecting, and/or, denying over
85 grievances, in effort to aid and abet each others
perversion which willfully and maliciously deprived him
of his due process of law.

108. Said Defendants were corrupt, which made the exhaustion
process corrupt, untrustworthy, and accordingly, a fraudulent
form of due process.

109. Wetzel, as the final policy-maker of DC-ADM 804, knowingly and
intentionally, through calculated administrative and political courses
of action, delegated authority to the aforesaid Defendants with the
handling of the grievance exhaustion process, knowing that
those specific individuals were corrupt enough to reject or
deny meritorious grievances, in an attempt to keep the
public view of conduct within the DOC as invisible as poss-
ible.

110. Accordingly, through correspondence with Plaintiff, Wetzel knowingly and intentionally, directed and/or acquiesced to the
aforesaid corrupt and manipulated exhaustion process that was
abused by the aforementioned Defendants.

111. Between January, and June 15, 2020, while Plaintiff was detained
and imprisoned within the DOC, he was repeatedly persecuted, ha-
rassed, and retaliated by numerous DOC prison staff members, due
to him filing grievances and threatening them with lawsuits.

112. Various prison officials used Plaintiffs grievances and notices
of lawsuits as the moving and motivating factor in:
A. filing false and fraudulent misconducts; and/or
B. misrepresenting material facts in misconducts.

113. During the aforesaid time-frame (Jan. 2019 - June 15, 2020), Schneck

and Moslak had individual and official employment duties, and responsibilities, of receiving, reviewing, and responding to prison misconduct reports, impartially, after adequate and thorough investigation at Camp Hill.

114. During this same time-frame, Yodis and Moslak had individual and official employment duties and responsibilities, of receiving, reviewing, and responding to prison misconduct reports, impartially, after adequate and thorough investigation at Phoenix.

115. Wetzel, established and maintained these employment duties and responsibilities through his policy statement under DC-ADM 801.

116. However, DC-ADM 801 fails to provide an inmate with detailed constitutional procedures in regards to them obtaining sufficient evidence, and/or, witnesses, that after investigation, would exonerate, and otherwise, clear them from punishment.

117. This deficiency in DC-ADM 801 undermines the inmates ability to determine whether the hearing examiners reviewing the misconduct report, provided constitutional safeguards, impartially, in their ultimate decision.

118. This deficiency, aforesaid, further undermines the inmates ability to file an adequate appeal, and challenge the process in which the hearing examiners provided.

119. This undermined policy, and constitutional deficiency, is the source behind Schneck, Yodis, and Moslaks' opportunity to alter, and improperly use, the misconduct review process, in a manner that deceives inmates into believing that they will adequately receive due process at their hearing, yet, intentionally finds inmates guilty of the misconduct without any investigation, or compulsory process for obtaining evidence,

and/or, witnesses, and merely rubberstamps each others wrongful agreement to find the inmate guilty without legal justification or proof.

120. The policy, aforesaid, also provides excessive punishment, by undue disciplinary detention sentences, which is by reason, cruel and unusual, with no rehabilitative interest.

121. Schneck, Yodis, and Moslak, additionally fraternizes with the authors of these misconducts prior to the hearing, which demonstrates improper conduct, and conspiracy, which forms a pre-determined decision of inmates guilt before the hearing even begins.

122. Plaintiff, in retaliation of him filing grievance against various prison officials, was accused of breaking various prison rules, where Schneck, Yodis, and Moslak refused to investigate properly, review surveillance footage, and/or, provide compulsory process to obtain evidence and witnesses in his favor.

123. By Schneck, Yodis, and Moslak being corrupt, ultimately made the misconduct review process corrupt, untrustworthy, and accordingly, a fraudulent form of due process.

124. Wetzel, as the final policy-maker of DC-ADM 801, knowingly and intentionally, through calculated administrative and political courses of action, delegated authority to Schneck, Yodis, and Moslak, with the handling of the misconduct review process, knowing that these specific individuals were corrupt enough to find all inmates guilty, in an attempt to justify the excessive punishments of undue disciplinary detention, which ultimately causes the public to form an inadequate and misinformed opinion of those in DOC institutions.

125. The Pennsylvania State Correctional Officer Association (PSCOA), is the labor union in which Defendants Lemancicz, Brown, and Schmeck are represented by in regards to their duties and legal affairs.

126. PSCOA, reviews also any misconduct said officers is accused of doing within the DOC.

127. PSCOA, with full authority to terminate correctional officers employment, that are breaching their PSCOA/DOC contracts, by their misbehaviors, however, continues to allow their unionized employees to misbehave and violate the constitutional rights of inmates without correcting them and/or terminating their employment, which ultimately allows these officers to engage in misconduct without worrying about losing their jobs.

128. Wolf and Wetzel contracts with the PSCOA which provides the DOC with individuals trained to be correctional officers.

129. However, Wolf and Wetzel has established and maintained a widespread practice of contracting with the PSCOA and obtaining correctional officers that have poor social skills, and criminal-minded, which aforesaid, caused Plaintiffs constitutional rights to continuously be violated.

Count One - Civil Conspiracy; Making and Enforcing Laws to Abridge Plaintiffs Right to Be Deprived of Property Without Due Process; Unreasonable Seizure of Constitutionally Protected Property; Religious Land Use and Institutionalized Persons Act; Right to Freedom of Speech and Association; Unjust Enrichment:

130. Plaintiff repeats and realleges paragraphs 1 through 129

Above as if the same were set forth herein at length.

131. As aforesaid, Defendants Long, Curran, and Mason, while at Phoenix, held a common purpose; and aided, and abetted each other upon that common purpose, in the unreasonable seizure of Plaintiffs legal/reference materials, and/or, books, and caused Plaintiff to spend $49.19 to have his property shipped.

132. The books in which Long, Curran, and Mason, conspired to keep Plaintiff from receiving after the aforesaid unreasonable seizure thereof, cost Plaintiff approximately $200.00.

133. Defendants, Schmuck, Weis, and Fahnestock, while at Camp Hill, held a common purpose; and aided and abetted each other upon that common purpose, in the unreasonable seizure of Plaintiffs legal mail, and Islamic chain, and caused Plaintiff to spend $3.77 to have his religious chain shipped.

134. The religious chain in which Schmuck, Weis, and Fahnestock conspired to keep Plaintiff from receiving after the afore- said unreasonable seizure thereof, cost Plaintiff approximately $150.00.

135. Long, Curran, Mason, Schmuck, Weis, and Fahnestock, had allegedly relied upon policy statement DC-ADM 815, in re- gards to "Property", and by doing so, enforced it upon Plain- tiff with intent to deprive him of his aforesaid protected property without due process.

136. Schmuck, Weis, and Fahnestock, had imposed a substantial burden on the religious exercise of Plaintiff in the seizure and complete confiscation of his religious chain without having a compelling government interest, being as though other Inmates of Christian faith were capable of wearing their religious crosses without any infringement.

137. As a result of the aforesaid Defendants' conspiracy to deprive Plaintiff of his constitutionally protected property, unreasonably, and without due process, caused money from Plaintiffs account to transferred to the DOC, causing the Defendants to be unjustly enriched.

138. As a proximate result of Long, Curran, Mason, Schmuck, Weis, and Fahnestocks acts and inactions, Plaintiff:

(A) suffered financial loss,

(B) lost legal books relevant to his civil matters,

(C) lost sentimental and valuable religious property,

(D) aggravation to his preexisting blood pressure and/or heart condition, through undue stress, anxiety, and mental anguish.

WHEREFORE, Plaintiff demands judgment against Long, Curran, Mason, Schmuck, Weis, and Fahnestock, in an amount in excess of $50,000.00, costs, fees, and prejudgment interest.

Count Two- Making and Enforcing laws To Abridge Plaintiffs Right Act To Be Deprived of Liberty and Property without Due Process of Law; Unreasonable Seizure of Constitutionally Protected Property; Right To Freedom of Speech and Association; Retaliation:

139. Plaintiff repeats and realleges paragraphs 1 through 138 above as if the same were set forth herein at length.

140. As aforesaid, Carr abused his authority, to unreasonably seize Plaintiffs protected legal materials, in retaliation of Plaintiff filing grievances, and motions to Federal Court, against his partners and colleagues at Phoenix regarding his legal materials and books mentioned above herein.

141. Carr deprived Plaintiff any due process before and after taking Plaintiffs legal property.

142. As a proximate result of Carr's acts and inactions, Plaintiff:

(A) suffered emotional distress.

(B) aggravation to his pre-existing blood pressure and/or heart condition due to undue stress, mental anguish, and anxiety.

143. Additionally, Plaintiff came down to Phoenix from Dallas as writ, and the confiscation, aforesaid, of his legal property by Carr, hindered Plaintiffs ability to prepare himself to go to Court.

WHEREFORE, Plaintiff demands judgment against Carr for an amount in excess of $100,000.00, costs, fees, and interest.

Count Three - Civil Conspiracy; Retaliation; Excessive Use of Force:

144. Plaintiff repeats and realleges paragraphs 1 through 143 above as if the same were mentioned herein at length.

145. As aforesaid, Defendants Lemanowicz, and Brown, in retaliation of Plaintiffs grievances against Carr, and other BCC staff at Phoenix, held a common purpose, and aided and abetted each other upon that common purpose, in the aforementioned acts of excessive use of force.

146. As a proximate result of Lemanowicz and Brown's acts and inactions, Plaintiff:

(A) suffered injuries to his wrists, hands, face, eyes, and head areas.

(B) pain and suffering for several months.

(C) aggravation to his pre-existing blood pressure and heart

condition due to undue stress, mental anguish, and anxiety.

WHEREFORE, Plaintiff demands judgment against Lemanowicz and Brown for an amount in excess of $200,000.00, costs, fees, and prejudgment interest.

Count Four - Making and Enforcing Laws To Abridge Plaintiffs Right Not To Be Deprived of Liberty and Life Without Due Process; State-Created Danger Theory; Deliberate Indifference:

147. Plaintiff repeats and realleges paragraphs 1 through 146 above as if the same were set forth herein at length.

148. As aforementioned, defendants Wetzel, Sorber, and Young, had established, and maintained, a practice of failing to take reasonable measures within Phoenix, to protect inmates therein, from the known outbreak of the coronavirus, to which infected and killed several inmates and staff.

149. This established practice, also failed to separate infected areas of the general population, from the inmates in segregated housing, creating a dangerous environment without testing, prior to having them interact in closed spaces.

150. This deliberate indifferent practice, created danger upon Plaintiff, as aforesaid, without due process.

151. The proximate result of Wetzel, Sorber, and Youngs acts and inactions, caused Plaintiff:

(A) to be in close proximity with possible infected inmates.

(B) wrongful extended time in disciplinary detention.

(C) aggravation to a preexisting blood pressure and heart condition due to undue stress, mental anguish, and anxiety.

WHEREFORE, Plaintiff demands judgment against Wetzel, Sorber, and Young for an amount in excess of $200,000.00, costs, fees, and prejudgment interest.

Count Five - Making and Enforcing Laws To Abridge Plaintiffs Right Not To Be Deprived of Liberty, and/or, a Speedy Trial Without Due Process of Law; Doctrine of Separation of Powers; Declaratory Judgments Act:

152. Plaintiff repeats and realleges paragraphs 1 through 151 above as if the same were mentioned herein at length.

153. As aforesaid, Wolf enforced executive orders, that clearly infringed upon Plaintiffs Constitutional rights to a speedy trial, causing conflict, by those orders being an obstacle to the accomplishments and execution of the full purposes and objectives of Congress.

154. Plaintiff had a legal and liberty interest in the outcome of both his motion and trial that was scheduled as aforesaid, to receive relief in a timely manner, however, Wolf's executive powers, interfered with the judicial powers of the criminal trial courts, and failed to provide any alternative process in having his rights honored.

155. Not only was Wolf's executive orders, aforesaid, in conflict with the Constitution, they were fraudulently represented, by stating that businesses that are "essential", could remain open, however, the criminal courts are "essential" to "timely" hear, and adjudicate, each matter, according to the individuals "fundamental" constitutional rights.

156. The proximate acts and inactions of Wolf caused Plaintiff:

(A) to be deprived of his pre-trial motion hearing and subsequent trial without due process.

(B) to be deprived of a speedy trial.

(C) to be left at Phoenix under inhumane conditions.

(D) wrongful extension of DOC confinement by being deprived of a timely appeal on his wrongful sentence.

(E) Aggravation to a preexisting blood pressure and heart condition, due to undue stress, mental anguish, and anxiety.

WHEREFORE, Plaintiff demands judgment against Wolf for an amount in excess of $25,000.00, costs, fees, prejudgment interest, and injunction relief in the form of:

(i) Wolf restoring Plaintiffs computation time that was taken away due to his executive orders.

(ii) Wolf exonerating Plaintiff from his open criminal matters, and/or, releasing Plaintiff from confinement to litigate his criminal matters from the street.

Count Six- Civil Conspiracy; Making and Enforcing Laws To Abridge Plaintiffs Right Not To Be Deprived of Life, and/or, Property Without Due Process; Unreasonable Seizure of Constitutionally Protected Property; Retaliation; Class-of-One Theory; Deliberate Indifference:

157. Plaintiff repeats and realleges paragraphs 1 through 156 above as if the same were mentioned herein at length.

158. As aforesaid, Hunter, Washington, and Dr. Mattec, held a common purpose, and aided and abetted each other upon that common purpose in their wrongful influence, and/or, direction, in

regards to Plaintiff causing intentional harm to himself.

159. The acts and inactions of Hunter, Washington, and Dr. Matteo deprived Plaintiff safety upon his life without any process.

160. The acts and inactions of Hunter, Washington, and Dr. Matteo, were deliberate indifferent upon Plaintiffs well-being.

161. The acts and inactions of Hunter, caused Plaintiffs constitutionally protected property to be unreasonably seized, and thereafter confiscated, without due process.

162. The acts and inactions of Hunter, Washington, and Dr. Matteo, were in retaliation of Plaintiff filing grievances, and threatening DOC staff at Phoenix with future lawsuits.

163. Hunter, Washington, and Dr. Matteo's conduct towards Plaintiff was personal, to where, the aforesaid acts and inactions aforesaid, were not done to any other inmate similarly situated as him.

164. The proximate result of Hunter, Washington, and Dr. Matteo's acts and inactions caused Plaintiff:

(A) property and financial loss.

(B) self-inflicted injuries that could have been prevented.

(C) placed in a suicide cell with a razor to kill himself.

(D) deprivation of psychiatric services.

(E) aggrevated blood pressure and heart conditions due to undue stress, mental anguish, and anxiety.

WHEREFORE, Plaintiff demands judgment against Hunter, Dr. Matteo, and Washington, for an amount in excess of $ 300,000.00, costs, fees, and prejudgment interest.


Count Seven- Civil Conspiracy; Retaliation; Class-of-One Theory; Unjust Enrichment; Deliberate Indifference:

165. Plaintiff repeats and realleges paragraphs 1 through 164 above as if the same were set forth herein at length.

166. As aforementioned, Dr. Matteo, and Hydro, held a common purpose, and aided and abetted each other upon that common purpose, to deprive Plaintiff required psychological and psychiatric services for his serious mental health conditions.

167. Dr. Prince, Dr. Jordstadt, Patel, and DeBoer, had also held a common purpose, and aided and abetted each other upon that common purpose, to deprive Plaintiff a prescription for Flexeril muscle relaxants, a drug used to relax muscles, which was medically necessary, to treat Plaintiffs serious lower-back spasms.

168. Defendants Dr. Matteo, Hydro, Dr. Prince, Dr. Jordstadt, Patel, and DeBoer, provided other inmates similarly situated, the aforesaid health care services, to which they deprived Plaintiff of, with no apparent, or logical reason.

169. Patel, used Plaintiffs prior lawsuit, and grievances, filed against him, as the motivating factor to deprive Plaintiff a prescription for Flexeril, knowing that without it, Plaintiff would suffer unnecessary pain from muscle spasms.

170. Dr. Prince, Dr. Jordstadt, Patel, and DeBoer, charged Plaintiff for his sick call appointment, however, by their aforementioned deprivation of treatment for his lower-back, they were unjustly enriched.

171. Hydro deprived Plaintiff psychological treatment services, due to Plaintiffs grievances against her, knowing that Plaintiff would continue to suffer mentally from lack of treatment.

172. Dr. Matteo, Hydro, Dr. Prince, Dr. Jordstadt, Patel, and DeBoer, were all deliberate indifferent towards Plaintiffs aforesaid health issues, by intentionally and gross negligently depriving him

treatment that was medically necessary, failing to establish an individualized treatment plan where protocol would have provided adequate care, and providing care under standards that amounted to no care at all.

173. As a proximate result of Dr. Matteo, Hydro, Dr. Prince, Dr. Vordstadt, Patel, and DeBoer's acts and inactions, Plaintiff:

(A) suffered unnecessary mental and physical pain.

(B) attempted suicide.

(C) preexisting mental health conditions deteriorated.

(D) awkward mobility.

(E) aggravation to preexisting blood pressure, and heart con-
ditions, due to undue stress, mental anguish, and anxiety.

WHEREFORE, Plaintiff demands judgment against Dr. Matteo, Hydro, Dr. Prince, Dr. Vordstadt, Patel, and DeBoer, for an amount in excess of $250,000.00, costs, fees, and pre-judgment interest.


Count Eight - Abuse of Process; Civil Conspiracy; Civil RICO; Due Process; Misfeasance In Office:


174. Plaintiff repeats and realleges paragraphs 1 through 173 above as if the same were set forth herein at length.

175. As aforesaid Defendants Sorber, Harry, Varner, Owens, Orlando, and Heist, intentionally, and with reckless disregard and a callous indifference to truthfulness, devised, participated and aided and abetted each other in a scheme to defraud Plaintiff, through a series of false and fraudulent pretenses, representations and/or promises, so that Plaintiff would file a prison grie-
vance to have his rights that have been violated by state actors, restored, and the state actor punished for those

violations.

176. For the purposes of executing their scheme, Sorber, Harry, James, Orlando, Owens, and Heist:

(a) acknowledged and utilized the grievance exhaustion process under Policy DC-ADM 804;

(B) encouraged Plaintiff to acknowledge and utilized the grievance exhaustion process under said policy;

(c) provided no other process to have his prison concerns addressed.

177. The various predicate acts alleged above are interrelated and were undertaken for similar purposes, with the common goal of inducing Plaintiff into believing that at some level of review, his prison concerns regarding violations of his rights, would be appropriately, adequately, and thoroughly reviewed, and investigated, and that he would, in fact, receive justice for the wrongs done to him, and/or, his property.

178. However, all said Defendants intentionally and willfully improperly used the grievance exhaustion process, by knowingly either rejecting, or denying each of Plaintiffs grievances, in an attempt to cover up the state actors unlawful, and/or, unconstitutional acts, and omissions, in which Plaintiffs prison grievances were in relation to.

179. Said Defendants were given delegated authority within their respective offices, to oversee, and handle the grievance exhaustion process, in a trustworthy and honest manner, so that Plaintiffs constitutional rights would be addressed in an appropriate, and timely manner.

180. However, said Defendants intentionally and willfully

used their office and position in the aiding and abetting of covering up their subordinates, colleagues, and/or, contracted employees acts, and omissions, with further intent to violate Plaintiffs due process rights by their perversion of the aforesaid exhaustion process.

181. The acts of racketeering have been and remain continuous.

182. To date, said Defendants continue to defraud Plaintiff, and others similarly situated, by their aforementioned illegal schemes, through their employed offices, and their afore-said delegated authority, making their entire network an illegal enterprise.

183. By the said Defendants acts and omissions, Plaintiff:

(A) was denied due process in a fraudulent manner.

(B) was deprived of protected property, and funds from his account, without due compensation.

(C) was deprived of healthcare complained of.

(D) was violated physically, mentally, and emotionally.

(E) was deprived of protection from corrupt prison officials.

(F) was deprived of access to the law library.

(G) was placed around other inmates during an outbreak of coronavirus-19 while at Phoenix.

(H) aggrevation to his pre existing blood pressure and heart conditions due to undue stress, mental anguish, and anxiety.

WHEREFORE, Plaintiff demands judgment against Defendants Sorber, Harry, Varner, Orlando, Owens, and Heist, for an amount in excess of $75,000.00, costs, fees, and prejudgment interest.

Count Nine: Abuse of Process; Civil Conspiracy; Civil RICO;

Due Process; Misfeasance in Office:

184. The aforesaid Defendants, Schneck, Yodis, and Moslak, intentionally, and with reckless disregard and a callous indifference to truthfulness, devised, participated and aided and abetted each other in the scheme to defraud Plaintiff, through a series of false and fraudulent pretenses, representations, and/or, promises, so that Plaintiff would file forms with them seeking witnesses in his favor, and statements of his own, whenever a state actor filed a false and fraudulent misconduct against him.

185. For the purposes of executing their scheme, Schneck, Yodis, and Moslak:

(A) acknowledged and utilized the misconduct hearing process under Policy DC-ADM 801;

(B) encouraged Plaintiff to acknowledge and utilize the witness, and statement forms provided under said policy;

(C) provided no other process to hear the allegations made against him.

186. The various predicate acts alleged above are interrelated, and were undertaken for similar purposes, with the common goal of inducing Plaintiff into believing that, at some level of review, his witnesses would be called in aid of the truth, and his statements, in opposition to the state actors misrepresentations, would be impartially balanced.

187. However, all said Defendants, intentionally, and willfully, improperly used the misconduct hearing process, by knowingly depriving Plaintiff an opportunity to call in his witnesses and additionally, partially reviewing his statements, for

reasons of aiding and abetting each other in providing support to the state actors' false and fraudulent allegations.

188. Said Defendants were given delegated authority within their respective offices, to oversee, and handle the misconduct hearing process, in a trustworthy and honest manner, so that Plaintiff received adequate due process upon his liberty interest.

189. However, said Defendants intentionally, and willfully, used their office, and position, in the aiding and abetting of rubberstamping "guilty" findings, and upholding them, by and through their intentional, and malicious failure of:

(A) investigations;

(B) calling witnesses; and

(C) partially reviewing statements given by Plaintiff.

190. Said Defendants additionally fraternized with the state actors, to whom filed the misconducts, in a sly manner, to which demonstrates and establishes an associated bond between them, in such a manner to show that Defendants made a pre-determined judgment prior to the misconduct hearing, further establishing prejudice against Plaintiff.

191. The acts of racketeering have been and remain continuous.

192. To date, said Defendants continue to defraud Plaintiff and others similarly situated, by their aforesaid illegal schemes, through their employed offices, and their aforesaid delegated authority, making their entire network an illegal enterprise.

193. By the said Defendants acts and omissions, Plaintiff:

(A) was deprived of due process in the determination of guilt or innocent process at his misconduct hearings.

(B) was given disciplinary detention sentences that were

egregious, unduly, and disproportionate to the alleged rule violation.

(C) was deprived of exercise, and opportunity to maintain good health.

(D) was forced to eat prison food that was non-nutritional, instead of being able to buy nutritive food items from the prison vendor.

(E) aggravation to his preexisting serious mental health conditions.

(F) aggravation to his preexisting serious blood pressure and heart conditions, due to undue stress, mental anguish, and anxiety.

WHEREFORE, Plaintiff demands judgment against Defendants Schneck, Yodis, and Mhoslah, in an amount in excess of $75,000.00, costs, fees, and prejudgment interest.

## Count Ten- Corporate Liability:

194. Plaintiff repeats and realleges paragraphs 1 through 193 above as if the same were set forth herein at length.

195. As aforementioned, Defendant PSCOA, established and maintained a widespread practice of:

(A) failing to uphold a duty to select and retain only competent correctional officers.

(B) failing to uphold a duty to oversee its correctional officers under its union authority.

(C) failing to terminate the jobs and employment, indefinitely, of correctional officers that have been proven to be incompetent, criminal, and/or, constitution violators.

196. Due to PSCOA's acts and omissions caused:

(A) correctional officers to continuously violate Plaintiffs constitutional rights.

(B) correctional officers to continuously violate their code of ethics, code of conduct, prison rules, and/or, other DOC laws.

(C) aggravation to Plaintiffs preexisting blood pressure and heart conditions due to undue stress, mental anguish, and anxiety.

197. PSCOA, through Mr. T. Blackwell (the President of PSCOA), its agents, employers, its principals, its insurers, and all those in active concert thereto, were obligated to terminate their unionized correctional officers jobs and employment for the aforesaid behaviors, yet failed to do so, which caused the aforesaid violations.

WHEREFORE, Plaintiff demands judgment against Defendant PSCOA for an amount in excess of $25,000.00, costs, fees, and interest.

## Count Eleven - Inhumane Conditions of Confinement:

198. Plaintiff repeats and realleges paragraphs 1 through 197 above as if the same were mentioned herein at length.

199. The conditions mentioned herein, by all named Defendants, caused Plaintiff to be unsafe, and deprived Plaintiff adequate food, exercise, and other basic human needs.

WHEREFORE, Plaintiff demands judgment against all Defendants named herein, for an amount in excess of $75,000.00, costs, fees, and prejudgment interest.

Count Twelve- Supervisory Liability; Misfeasance in Office:

200. Defendants Wolf, Wetzel, Sorber, and Harry, had duties and obligations, within their respective offices, to assure Plaintiff that their subordinates, and/or, contracted employees, performed their daily job descriptions in an unconstitutional, and unlawful manner.

201. The Defendants were placed on notice through various forms of communication, of how Plaintiffs constitutional rights have been continuously violated by their subordinates acts and omissions mentioned herein.

202. However, Wolf, Wetzel, Sorber, and Harry, with knowledge of their subordinates wrong doing, turned a blind-eye, condoned, and/or, acquiesced to their subordinates wrongful, and unconstitutional behavior without taking action.

203. The failure of said Defendants to intervene upon the corrupt behavior of their subordinates, demonstrated a breach of their official duties in office, which further established a corrupt prison administration.

204. Due to Wolf, Wetzel, Sorber, and Harry's acts, and omissions, Plaintiffs constitutional rights, aforesaid, were continuously violated, and the only way to seek relief therefrom was to file a civil lawsuit, since the administration of the DOC, and its delegated grievance coordinators, were all corrupt in their respective offices, making its corporation as a whole, an illegal enterprise.

WHEREFORE, Plaintiff demands judgment against Defendants Wolf, Wetzel, Sorber, and Harry, for an amount in excess of

$50,000.00, costs, fees, and prejudgment interest.

6/29/20

Charles Talbert
CRA4727
SCI. Phoenix
1200 Mokychic Drive
Collegeville, PA. 19426

Verification:

I, Charles Talbert, hereby verify under penalty of perjury that to the best of my knowledge, information, and belief, the foregoing complaint written herein is true and correct.

6/29/20

Charles Talbert

Charles Talbert
QA4727
SCI - Phoenix
1200 Mokychic
Collegeville, PA 19426

"Legal Mail"

PA DEPARTMENT OF
CORRECTIONS
INMATE MAIL

neopost
06/30/2020
US POSTAGE $001.50

ZIP 19426
041M12252211

FOREVER USA

Barn Swallow

To:

William B. Nealon F...
And U.S. Court
235 N. Wash.
P.O. Box 1148
Scranton, ...

Middle District of Penns...

RECEIVED
SCRANTON

JUL 0 6 2020

PER_____ DEPUTY CLERK